is M. v. Premera Blue Cross. Case number is 18-4098. Counsel, we're ready to hear you. Thank you, Your Honors. May it please the Court, Brian King is my name, representing the plaintiffs in this case. The first issue that is important for the Court, considers the threshold issue in any ERISA benefits case, which is the question of what's the benefits. This is dealt with repeatedly, dealt with most recently in the case of Hodges v. Life Insurance Company of North America, which we submitted as supplemental authority yesterday. That was a case that was decided on April 2, 2019. In that case, the Tenth Circuit illustrated the importance of examining carefully what language, if any, exists in the governing plan document or the summary plan description, whatever is provided to the participants and beneficiaries so that they'll understand what their benefits are. That case, as well as many others in the Tenth Circuit and across the country, illustrates the need for full disclosure of discretionary authority language before a plan is able to come to you and request deference to their decision. The Supreme Court, in the Firestone-Tyrone River v. Bruck case in 1989, made very clear the default standard of review is de novo. And that's critical. The standard of review makes the difference oftentimes between winning and losing these cases. At the very least, it tilts the playing field significantly. In this particular case, I think it's undisputed that there's no language in the summary plan description that provides any sort of discretionary authority. What we're dealing with is a document entitled, quote, plan instrument, unquote, that was not provided until literally the time the first submissions were provided to the trial court, district court, on motions for summary judgment. That was provided by the defendants. And we said, wait, wait, wait. This isn't a document that's referred to in the SPD. It isn't identified in the SPD. The plan participants and beneficiaries don't have any clue about this language. That clearly, in the plan instrument, grants discretionary authority. So we contend, first of all, Your Honors, that it was error for the district court to allow that document to come in and alter the relationship between the parties as to what the standard of review would be. And I think that's fairly clear. The district court suggested that there was an ability on the part of the defendants to read the two documents together in terms of presenting discretionary authority language to the court that would allow it to utilize an abuse of discretion. What do you contend the standard should be? De novo. And the reason is that it should be de novo is because there's simply never any language that was presented in the summary plan description to participants and beneficiaries giving them notice of any discretionary authority. Now, notice is critical. We've got the serialist case from this court. We've got member services case from this court, which we quoted. They based their rulings on the Shinnejong case from the U.S. Supreme Court, which says notice is critical. What notice is given to plan participants and beneficiaries of their rights and obligations under an ERISA plan is at the core of what ERISA is all about. And so in that sense, we think it was error for the district court to say either the administrative services agreement, which also has discretionary authority language, or this undisclosed plan instrument, unquote, unquote, forms the basis for a discretionary authority or an alteration of that de novo standard of review. Let's say we've heard of the serialist case and whether or not there's an obligation of the plan to disclose the plan instrument. Hypothetically, let's say you have a contract, just a labor services contract, and you spell out what the rights and the obligations of each party are. But you don't specify, if this goes to litigation, what standard would be applicable in the state district court or the federal district court. It seems to be that there's an argument, at least, that the standard of review of the decision maker is something that is independent of the rights and obligations of the parties. Well, that may be in some other circumstances, but it's certainly not the case in the context of ERISA. ERISA is all tied to what rights and obligations are disclosed. And the reason for that is the courts view these ERISA plans very much as contractual documents. It's a contractual relationship we're talking about. But overlaid on that is a fiduciary relationship, because the Congress and the federal judiciary recognize we're not at all dealing with people who are anywhere equivalent to bargaining power, negotiating power, or knowledge. And so Congress has said, and the federal judiciary has been faithful in adhering to this, you've got to disclose all the material terms of rights and obligations. So I think that there may be circumstances where you have other contractual relationships where relatively equal bargaining power or relatively sophisticated parties. That doesn't apply here, though. That fiduciary obligation to disclose is critically important to ERISA One of the things that we've talked about, the defendants, the premier and Microsoft say, well, listen, we were reading these things together. The district court adopted the idea that you could read these things together. The Eugene S. case in this court from this precedent from the Tenth Circuit is distinguishable. Eugene S. said you could under certain circumstances read a summary plan description with a policy, a group policy was the term that was used in that case. But that's because the SPD referred to the group policy. That's distinguishable from this situation. We also contend that there were violations of the summary, or rather of the claim procedure regulations that ERISA has that take it down to de novo. We've argued before, I know Chet Jaid has a case in which I've argued before, HALO versus Yale Health Plans, a case from the Second Circuit, should be something that the Tenth Circuit takes a harder and closer look at in terms of whether we allow the substantial compliance doctrine of the claim procedure regulations to continue forward. That's something that's briefed well and I don't feel the need to repeat it here in oral argument. But we do think that there were some violations of the claim procedure regulations that justify taking these otherwise abusive discretion standard of review in the event that you don't accept our first argument. Even if there is an abusive discretion standard of review that it knocks it down because of the violations of ERISA's claim procedure regulations. And let me just ask you, and I don't want to disturb your strategy and argument, but there is one aspect that I was a little curious about, and it was a footnote in Primera's brief, I think it was footnote six, that said that the regulations under the Affordable Care Act in Title 45 of CFR specifically contemplate that there's going to be new additional evidence. So with regard to, at the administrative review process, the argument implicitly, I think, is that, well, there wasn't a shift in the rationale because now the regulations under the Affordable Care Act specifically assume that there's going to be new and additional evidence presented on administrative review. How do you answer that? Well I think that you can have, I mean that's inherent to some degree in the process of the administrative appeal process, the pre-litigation appeal process. If you're going to have a meaningful dialogue, which this Court has said has to take place, that contemplates some understanding of defenses and arguments and evidence and information that would suggest an evolution of thinking. I don't have a problem with that. I think the problem is, and it's a very fact-sensitive determination, Judge Bachrach, I don't think that you can overlay it with one simple rule that says it always applies or always doesn't apply, as to when a shifting rationale is disingenuous or when it's unfair. So this is a situation where the district court said, yes, they shifted rationale here, but it was understandable and it was permissible. I have a tendency to think of other cases where shifting rationale is more clearly problematic from my perspective, so that aspect of the district court's ruling doesn't really trouble me that much. But I think the problem is, we never had a chance to ever present to either Premier or Microsoft an argument about medical necessity for this young woman. That argument was made as the last appeal internally to Premier, and they said, the only other resort you have in terms of getting a review on this is to ask an external reviewer to look at it. We believe that we should have had an opportunity to present information to Premier as part of the internal review process on the medical necessity issue. They chose not to do it. There's nothing in the claim procedure regulations that right now, as I can see, require them to do that, but I think it informs the court's thinking about how this external reviewer opinion should be received. And that goes to this question. Well, you were allowed to provide medical records. And we did in that last stage. And recommendations. That's right. That's right, Your Honor. And the summary plan document, does it refer to the master plan? No. There's no reference to the plan instrument in that SPD, the summary plan description. That's the problem in terms of the statute. Were you aware that there was? No. Were you informed in any way that there was? No. Not until I received the... Was it available to you? It was available in the sense that they say... How did you know it was available? We didn't know. That's the point. In the plan instrument, it says, Microsoft and Premier... So isn't the answer to my question, I don't know, rather than yes? The answer to your question is, we didn't know at the time that it was available to us. When did you find out? When they submitted the plan instrument with the declaration of opposing counsel, when Premier and Microsoft submitted their opening memo on their motion for summary changes. And that was the first time you knew that the SPD was not the entire insuring instrument? That's the first time that we knew that's what Premier and Microsoft were saying. That's correct, Your Honor. Thank you. That's the prejudice. That's the problem. I mean, if this had been... Even if we were to go under a de novo review, wouldn't the result be the same? I don't think so. Here's why, Your Honor. I appreciate that question. A de novo review gives us the ability to look at the criteria in a way that the reviewers didn't look at the criteria. And we've made the argument in the briefs that there are references, particularly in the Primera review from Almed, the reviewer, that's on page 424 of the record. There's a reference on page 424 to the Almed review in which they talk about, well, the patient wasn't homicidal or suicidal or actively psychotic. That's the wrong measuring stick. You can't measure medical necessity of these kids based on the wrong system of measurement. Why? Because it yields the wrong result. I mean... Begging the question. In other words, with Dr. Hartman and the IRO reviewer, they were specifically asked, I'm giving you this medical policy. These are our is based on current prevailing medical standards and based on the plan instrument, criteria for medical necessity, was this care, residential treatment care, medically necessary. So it really doesn't matter whether there was a conflict with the specific language in the medical policy, because that's not what they were being asked to do. Well, they weren't being asked to do that. But the problem is, again, going back to the parties, the family had the ability to say, look, the language in the plan, in the SPD, or in the criteria that should have been used is something that we're entitled to receive. We don't need to tolerate some changing of the criteria. Well, that's going back. I mean, I don't know how that... What I'm asking you is on the merits of Judge Lucero's question. I mean, that's a good argument, I think, for de novo review. But assume we get there, go back to Judge Lucero's question on the merits. I don't understand why there was a misapplication of the medical policy when the medical policy was not what Dr. Hartman or the IRO reviewer were being or should have been asked to consider. Well, the IRO should have been looking at the language of the policy under the terms of the plan. For it to look at anything else is a violation of the terms of the plan. You can send it out to external review if you want, and the external reviewer can say what they want. But if they don't use the correct measuring stick as lined out into the terms of the plan, there's a problem. Then how did they... Putting aside the medical policy and the plan instrument criteria for medical necessity, what specifically did Dr. Hartman, the IRO reviewer, or Primera, what did they misapply out of the plan instrument definition of medical necessity? There's a reference to the plan instrument, to the SPD, the summary plan description, the need to have significantly impaired functioning. If you have significantly impaired functioning or behavioral discontrol, that requires 24-7 treatment. And that's what we had here in a way that neither the independent reviewer nor Primera. And you're saying that's not in the medical policy, that's in the plan instrument? That's in the plan instrument. I believe it's in the criteria too, Your Honor. I can't tell which one where specifically that language applies. But it's not specifically referred to by the external reviewer. And with that, I'll reserve my time. Reserved. Good morning. Good morning, Your Honors. My name is Gwendolyn Payton. I represent Primera Blue Cross, the third-party administrator for the Microsoft plan. Why don't we begin with the paper products, please? We are told that the SPD does not have an internal reference to the plan, to the plan instrument. Is that correct? That is incorrect, Your Honor. If you look in the record at 950, you will see a reference to the right of the member to receive the plan documents. By the very nature of the title of the document, it is a summary plan description. The very first paragraph says, this is a summary of your plan. There is a plan that exists, and the member was notified of the right to get it if she so requests. Where is that? Would you read that from the SPD? That becomes an important question. If you look on page 950 under internal review and time frame, it says there in the first full paragraph, you may ask to examine and receive free copies of all pertinent plan documents, records, and other information relevant to your claims by asking Primera. So if you are doing an appeal and you want to look at the totality of the plan document, you can absolutely do that. What's the heading for that paragraph that you just mentioned? Internal review and time frame. Not judicial review. So if you're looking to find out all of the plan documents that are going to govern your ability to go through an administrative appeal within Primera, then you can get all of these documents. But that has nothing to do with what your adversary is arguing. It's all about judicial review. In the paragraph for judicial review, it doesn't say anything about your ability to get the plan documents. I don't think in the summary plan description there's anything about judicial review other than under the law of the state, it's not a final determination once the IRO comes out. But you raise an interesting policy issue, Your Honor, which is, why are we mixing apples and oranges here? Mr. King makes an interesting argument that had the members known, he makes this in his brief, that they would not have received a deferral, that if they were going to receive arbitrary and capricious review, they wouldn't have brought their claim. Now, the issue is, what do we want, when we're talking about the plan description, the reviewers to be doing? And this is why we have deference, because we are sending these claims to independent review, both time, with an independent child psychologist. We do not want the child psychologist thinking, you know, I get deferential review, so this is it, I don't have to be thorough and do this absolutely correctly. We want those reviewers probably, as a matter of public policy, to assume that she's going to be reviewed under a de novo standard. And we know in ERISA that standard of review is a judicially imposed thing that fluctuates depending on the conduct of the party, right? Mr. King is also arguing that there are things that could have happened in this administrative review that turn the review back to de novo, despite the discretionary clause in the plan document. So it is too facile to say that judicial review is somehow part of the administrative process. It really isn't. But I agree with Mr. King that the member is entitled to look at the plan document, she is a member, and she can do so, and it is here. Often the SPDs will have an introduction that says, this is a summary of your plan, the full plan is contained in such and such an instrument, and you may review that instrument, and the instrument is held at the offices of so-and-so, if you have a question, please refer to such a person. This doesn't contain any of that preliminary... Preliminary language? It does not have... It has this general how this plan works, and it talks about the health saving plan, generally, and it says what it does, and it does tell you that this is a working document, as a summary plan description is, to help you with the specifics for implementing the terms of that plan. It does do that. Yeah, and I would look, Your Honor, at page 901, where you find that there, under the 2015 summary plan description. And I think to the point of how... To the point that the state of Washington requires an independent review, was that actually requested, or does it happen automatically? It has to be requested by the member. And it's very telling, because you will also see in the plan, and I think this is pretty important, that the plan notes that when that is requested, as mandated by Washington state law, that claim goes to the insurance commissioner for adjudication. It is out of the hand of the administrator at that point. The administrator is bound by the decision, and it says so in the plan description, and cannot alter the result. At that point, there is nothing that the administrator is doing. It's mandated by state law. The reviewer is selected by the insurance commissioner, and the plan is bound by that result. And on top of that, Your Honor, this case is a case about that system, and that regulatory overlay working for a member. You can see the immense amount of due process that this claim receives. First, it goes to Dr. Small, who is IT-Primera Behavioral Health Specialist. He looks at it and says, if this person requires 24-7 hours of confinement, and never forget in these cases, this is 24-7 confinement of a child. It is not something to be taken lightly. He says, he actually calls the provider, and says, you have to have a psychiatric evaluation within 48 hours before you confine a child. She has to be under the care of a psychiatrist every week. She needs to see the psychiatrist, and she needs to be at a minimum in individual therapy twice a week. The facility says, we don't do that. And in fact, you'll note from the record, she never saw a psychiatrist or any medical doctor until 11 days after confinement. On that basis alone, he says no. Then, the letter goes out to the members and says, you are entitled to appeal this. And you can submit whatever you want in that appeal. Now, contrary to what counsel said to you, the mother wrote a lengthy, passionate, and very detailed, thorough, and helpful letter at that point. And that letter says a lot about the medical necessity issue. It is just false that they did not get an opportunity, and they did not, in fact, address that medical necessity issue on the first appeal. And you'll see that in the record at 1075. They unilaterally decided to address the intensity of the problem, but they were responding to the intensity of the treatment rationale. She was responding to both, Your Honor. Well, actually, the facility responded to the intensity of treatment. They wrote a letter back. By the way, they didn't say that she sees the psychiatrist once a week. And you will find, from looking at the record, she did not see a psychiatrist, but for, at most, once a month. And they skipped many months. She's there for about 14 to 15 months. Some months, she never sees a psychiatrist at all. But the mother's letter is very thoughtful about the medical necessity issue, as well as the intensity of treatment issue. Primera takes that and sends it to external review, because Primera wants it adjudicated by a child psychologist, independent of the plan. The child psychologist looks at two issues. One, does this fit the medical necessity definition? And in addition, the behavioral treatment medical policy that overlays that for the confinement of a child 24-7 determines no. That independent reviewer also looks at the issue of, is this the standard of care in medicine for this situation? And says, yes. At that point, the members receive another letter saying, this is what was determined. You are entitled to do another independent review with the insurance commissioner. Okay, I don't want to interrupt your train of thought, but I want to make sure I understand. And that's the Dr. Hartman review, right? The first one is Dr. Hartman. When Dr. Hartman is asked to make that review, is he being asked to make that review based on the medical policy, the plan instrument, or both, or neither? Actually, the answer is all of the above. Because he's asked all those questions. One is, okay, there's a generalized medical necessity definition in the summary plan description. The summary plan description also says, we rely on specific medical policies for specific issues. And you can see it in there. And when we have a medical policy that speaks to the actual science on your particular condition, we will also look at that too. I felt prepared to tell Dr. Hartman and the IRO reviewer, don't focus on the medical policy. Am I wrong about that? No, you're right. They ask him two questions. One is, is it correct under the medical policy and the plan, what we have done? He says yes. And then they say to Dr. Hartman, also, please tell us, is our medical policy correct? Are we using the right medical policy here? And is our medical policy state of the art? He says yes. Now, it's a little different under the IRO, because that's statutorily mandated. And there, the Washington statute says, the medical reviewer is not bound by the medical necessity definition in the plan documents. So he is free to diverge from that if he feels that the plan is applying the wrong medical policy. And so in that review, you see he says, this is the medical consensus on this. And actually does, in fact, look at the medical policy as well. So they're looking at the totality of this description. And this is important, because this kind of circles back, I think, to our policy issues about the standard of review. We want to empower the medical doctor to do the right thing here for the member. And that's what's happening here. And this vast amount of regulatory overlay is there to protect the member from two things. One is a bad medical decision and also an infirm medical policy being applied to that particular member. Everything here shows that due process was afforded. And this was the correct decision. Now, Your Honor, ask a question about what if we were doing de novo review here. I don't think this is a case that falls into that slipshod of cases where a decision might be different under the standard of review. I think that Primera prevails even under a de novo analysis. I think that if you are looking at it from that standpoint, if you look at that admitting psychological evaluation, and that's in the record at 1143, it's really the moment that the plan needs to see is this person in significant impairment enough to require 24-7 confinement, not to least for 15 months of her adolescent life. Again, a very significant psychological moment in the life of a child. And it's done 11 days after admission. There is nothing in that record that says that she is a harm to herself, a harm to others, or that she's in a psychological state that requires this level of intensity. Every reviewer who has looked at this has said she needed mental health treatment, but she needed a lower level of intensity. She needed outpatient treatment. She needed partial hospitalization. And the goal of that in the literature is to keep the child with the family, to keep the child stabilized in society, not to confine them outside. And it's very, if you look, your honors, at what the child says and what the parents say about why they have admitted her. And the child says to learn and use coping skills for anxiety. That's her self-diagnosis of why she is there. And the parents say they want her to be more confident, less depressed, less anxious. And that is it. And you see what happens in the treatment center. She spends a lot of time in classes. She goes to self-esteem class. She goes to body image class. She goes to art therapy. She goes to anti-bullying. She goes to friendship development classes. These are probably all laudatory and beneficial things for the child. They are not medical treatment. And they are not medically necessary, certainly under the terms of the plan. Now, what your adversary might say, and has essentially said, is that this wasn't just some lark that the parents decided to put her in this treatment facility. They had to take her out of school, put her in this home-down program. And she couldn't even do the home-down program because of her mental problems. And then was told by doctors, you need to go to this facility. And so that seems like a pretty good argument that it was medically necessary when she's got doctors saying, yeah, you have no choice. You've got to put her in this facility. Two things. I agree. She needs medical treatment. No one is questioning that. But she needs the right level of care. And it is as harmful to a mental health patient to over-treat as to under-treat, right? We have to get this at the right level of care. And every reviewer says, you're right. Let's put her in partial hospitalization. Let's get her outpatient treatment. But not 24-7 confinement. Under the literature, this is not helpful to the child. And it is not what is required. Second point. And this is important. The reference to another physician saying that she needs to be confined 24-7 only appears once in the record. And that is in the letter from the mother with the original. And she says, a counselor said that. That is the only place. What we don't have is talent. We don't have any letter from a treating physician. None. We do not have a single letter in this record from somebody who saw this child contemporaneous speaking to the level of care issue. We don't have a psychiatrist. We don't have a counselor. We don't have anything. All we have is the mother saying, somebody said this would be a good thing to me. Now, in the question for this court. Your time is up. But there is one question that just has to remain. And that is, with respect to this intermediate level of care that you say is maybe the more appropriate way to deal with this case. Is that currently being offered to this child and these parents? It is covered under the plan. Thank you. Questions? All right. Thank you. Counsel, why isn't that last inquiry the short answer to the dilemma in this case? Why isn't the appropriate level of care that is the present state of the record, the proper care for this child? Well, that's the question is, what is the appropriate level of care? Now, you've got individuals who were advising the family, treating this young woman in New York before she went out to Utah. They were saying, you need residential treatment. And that's the individual recommendations of those who knew that family best and knew that child best are far different than paper reviewers in terms of their ability to assess the medical necessity of the child. So I think what is appropriate, and we haven't been as clear in the briefing. I was struck with this as I came over reviewing this. We haven't been as clear in asking you what we'd like. We'd like a remand with a de novo standard overview to the district court to carry out an evaluation of medical necessity based on the proper criteria. You asked, Judge Bachrach, well, what's the proper criteria? The proper criteria is outlined in the plan document itself and in the criteria for the plan document. That's what I was referring to. When you say the criteria for the plan document, the medical policy? Yes, the medical necessity criteria. That talks about significantly impaired functioning or behavioral discontrol requires 24-7 treatment. Now, I'm not saying we'll necessarily win that inquiry. We could win. I mean, we could lose that inquiry in front of the district court or in front of Primera on remand, depending on who it's remanded to. But I think remand is important for purposes. My concern is that the appellate process takes a long time. This case must have been kicking around in the courts for a year and a half probably to get to today, and the child has been in the need of care in the entire interim period. You're now proposing to have the litigation continue. Let's look at the child here for a moment. Just so you know, the family was committed to this child's welfare. That child got the treatment that she needed, fortunately for her, at this facility, and she has continued to get that treatment. It's just a question of whether this family is entitled to reimbursement at this point. Thank you. Thank you, Your Honor. Yeah. Oh, yes. We have a question. Really, this is, if I could just answer this generally for both sides. On the application for a sealing order, you all had asked, as I read it, to seal volume two. I think that might have been a typo because you said it was over like 1,100 pages. Volume two is like a couple hundred pages. It should be all volumes. I assume you mean two through six. That's correct, Your Honor. You also, within two through six, is the SPD. I assume that there's no need to seal the summary plan description. Is there? That's correct, Your Honor. Okay, thanks. Thank you for that clarification. Thank you. Counsel are excused. The case is submitted.